**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

UNITED STATES OF AMERICA,

v.

Criminal No. 89-00036-2 (BAH)

LAMAR HARRIS,

Chief Judge Beryl A. Howell

Defendant.

## MEMORANDUM OPINION AND ORDER

After being convicted twenty-eight years ago and serving over twenty-three years of incarceration and almost five years of his ten-year term of supervised release, the defendant, Lamar Harris, has moved, pursuant to 18 U.S.C. § 3583(e)(1), for early termination of his term of supervised release. Def.'s Mot. Term. Super. Rel. ("Def.'s Mot.") at 3, ECF No. 445. The government opposes this motion. Gov't's Opp'n Def.'s Mot. ("Gov't's Opp'n") at 1, ECF No. 448. Upon consideration of the record in this case, and after a hearing, held on June 15, 2017, for the reasons set out below, the motion is granted and the defendant's supervised release term is reduced from 120 months to 60 months.[1]

## I.    BACKGROUND

The defendant's offense conduct, convictions, sentencing history and current situation are described below.

### A.  The Defendant's Offense Conduct

On direct appeal, the D.C. Circuit described the offense conduct of the defendant and his four co-defendants, who were all convicted after a jury trial of "participa[ting] in a large-scale

---

[1]      This case was directly reassigned to the undersigned on January 10, 2017, since the original sentencing Judge has retired. D.D.C. LOCAL CRIMINAL RULE 57.14(6).

drug distribution business" responsible for "import[ing] large amounts of cocaine from New York City and distribut[ing] the cocaine in northeast Washington, D.C." through use of "many 'runners,' couriers, lookouts, and other helpers." *United States v. Harris*, 959 F.2d 246, 249 (D.C. Cir. 1992) (*per curiam*). This drug distribution operation was "presided over" by the "kingpin," co-defendant Michael Palmer. *Id*. Although Palmer had been operating the drug distribution business since at least March 1987, the defendant apparently joined this illegal operation "after December 1987," Presentence Report ("PSR"), dated Sept. 1, 1989, ¶¶ 9, 11, when the defendant was only nineteen years old. The defendants engaged in "acts of armed violence by which the defendants attempted to protect their 'turf' against competitors," including an assault against "one of their sellers who failed to pay for cocaine that he was given to sell," prompting the defendants to then hold him "for several days in an abandoned apartment." *Harris*, 959 F.2d at 249.

As described by the sentencing Judge, the defendant served as "Mr. Palmer's right-hand man" in the drug operation. Gov't's Opp'n ¶ 4 (quoting Sentencing Hr'g Tr., dated Oct. 18, 1989, at 11–17). Specifically, the defendant (1) "was found to have fired shots in the courtyard of Mayfair-Paradise to intimidate people"; (2) was, at a minimum, "present" when an Uzi was placed in the mouth of a woman "because she permitted other dealers to use the apartment"; (3) "was implicated" in the incident where the seller "was held captive and beaten"; and (4) "[i]n Kentland, Harris was going to shoot somebody, but the gun jammed." *Id*. In sum, the defendant was found to be "a major figure in the drug distribution ring" and to have "personally used guns and actual violence to further his business, and used juveniles." *Id*.

**B. The Defendant's Sentence and Subsequent Sentence Reductions**

In October 1989, when the defendant was twenty-one years old, he was convicted, after a jury trial, of fifteen charges: conspiracy to distribute and to possess with intent to distribute cocaine base (Count 1), conspiracy to carry and use firearms during and in relation to a drug trafficking offense (Count 3), use of a juvenile in drug trafficking (Count 4), carrying a firearm in relation to a drug trafficking offense (Counts 6, 11, 14, 16, and 19), distribution of cocaine (Counts 8 and 12), distribution and possession with intent to distribute fifty grams or more of cocaine base (Counts 9 and 20); assault with a dangerous weapon (Count 13), unlawful use of a firearm in aid of drug trafficking (Count 21), and unlawful receipt and possession of an unregistered firearm (Count 23), in violation of 18 U.S.C. §§ 371, 924(c), 21 U.S.C. §§ 841(a), 841(b)(1)(A)(iii), 845(b), 846, 26 U.S.C. § 5861(d), and 22 D.C. Code 502, for which offenses he was originally sentenced to concurrent terms of life on Counts 1, 4, 9, and 20, a concurrent five-year term on Count 3, concurrent twenty-year terms on Counts 8 and 12, a concurrent ten-year term on Count 23, a concurrent three-to-nine-year term on Count 13, mandatory consecutive terms of five years on each of Counts 6, 11, 14, 16 and 19, and a thirty-year mandatory consecutive sentence on Count 21. *See* Judgment ("J&C"), dated Oct. 20, 1989; Order Amending Judgment and Commitment ("Amended J&C"), dated Oct. 30, 1989; Sentencing Hr'g Tr. at 17–18, Oct. 18, 1989.[2] In addition, upon his release from prison, the defendant was sentenced to supervised release terms of ten years on Count 4; five years each, to run concurrently, on "Counts 1, 9, 20 and 21"; and three years each, to run concurrently, on "Counts 3, 6, 8, 11, 12, 14, 16, 19 and 21." J&C at 4.[3] Thus, in total, the defendant was originally

---

[2]     The defendant was acquitted of five charges in Counts 5, 7, 10, 17, and 18. J&C at 1.
[3]     The Judgment incorrectly provided different terms of supervised release on Count 21.

3

sentenced to a term of "life plus fifty-five (55) years," with ten years of supervised release to follow. Amended J&C at 1.

The D.C. Circuit's descriptive language in a recent case aptly applies here: "Anyone seeking to follow the path of [defendant's] conviction and search for post-conviction relief will find a long and winding trail." *Day v. Trump*, No. 15-5144, 2017 WL 2697981, at *1 (D.C. Cir. June 23, 2017). In a series of both direct and collateral appeals, the defendant's convictions and associated sentences were chipped away. Beginning on direct appeal, the defendant's conviction on Count 23 was vacated, along with his sentence on this count of a concurrent ten-year term of imprisonment. *Harris*, 959 F.2d at 261 (affirming "all of the challenged convictions and sentences with the exception of Harris' . . . conviction[] under 26 U.S.C. § 5861(d)"); Order, dated May 21, 1993, ECF No. 25. His sentence was further reduced when his petition, pursuant to 28 U.S.C. § 2255, was granted, in part, by this Court following the Supreme Court's decision in *Bailey v. United States*, 516 U.S. 137 (1995), resulting in vacatur of his convictions and corresponding consecutive five-year sentences for each of five violations of 18 U.S.C. § 924(c), in Counts 6, 11, 14, 16, and 19. Order, dated May 13, 1999, ECF No. 180. Subsequently, the defendant's petition, pursuant to 28 U.S.C. § 2241, was granted, in part, by the United States District Court for the Southern District of Illinois, in which district he was then serving his sentence, resulting in vacatur of his conviction on Count 21 and corresponding consecutive thirty-year sentence, for a firearms offense involving a machine gun, *see* Order, No. 02-779-JLF, dated Dec. 15, 2004, ECF No. 316-2, thereby reducing the defendant's sentence to life imprisonment. Next, on October 19, 2009, without government objection, this Court granted the defendant's motion, pursuant to 18 U.S.C. § 3582(c)(2), to reduce his life sentence to a term of

325 months' imprisonment, based on retroactive application of an amended guideline applicable to crack cocaine offenses. Order, dated Oct. 19, 2009, ECF No. 319.

In October 2011, the defendant moved for another sentence reduction to a sentence of time served based on the U.S. Sentencing Commission's Amendment 750, which lowered the sentencing ranges for crack offenses. *See* Def.'s Mot. Reduce Sentence (citing UNITED STATES SENTENCING COMMISSION, GUIDELINES MANUAL ("U.S.S.G."), App. C, amend. 750), ECF No. 336. The government opposed this request, arguing successfully that the defendant's responsibility for trafficking in over 8.4 kilograms of crack did not entitle him to any reduction in his sentencing range even under Amendment 750. *See* Gov't's Opp'n Def.'s Mot. Reduction Sentence, ECF No. 359. The defendant's sentence reduction motion was denied, pursuant to 18 U.S.C. § 3582(c), since his "sentence was not based on a sentencing range that has subsequently been lowered by the Sentencing Commission." Mem. & Order, dated May 21, 2012, at 10, ECF No. 380.

### C. The Defendant's Rehabilitation and Current Circumstances

During the first decade of the defendant's incarceration, he accumulated a number of infractions on his prison disciplinary record, but throughout the last eight years of his imprisonment, his record remained infraction free. Probation Mem., dated Nov. 1, 2011, at 2, ECF No. 347. In addition, while incarcerated, he participated in a number of treatment, educational, and vocational programs, including residential drug treatment, general education development, and adult basic education. *See id.*

The defendant completed his sentence of 325 months' incarceration on December 7, 2012, and has been serving his ten-year term of supervised release for the last four years and seven months. Def.'s Mot. at 3. Continuing the positive conduct he began while incarcerated,

the defendant successfully completed his stay in a halfway house and has been infraction free while on supervised release. *Id.* He moved to Savannah, Georgia, to live with his wife, who works as a legal assistant; had a child, who is now two years old; and has remained successfully employed full-time and even received a promotion. *Id.* at 3–4. In addition, the defendant's sister-in-law, who spoke at the motion hearing, attested to the defendant's regular attendance in church with his family and his long-term volunteer activities with the Big Brother, Big Sister program, *see* Mot. Hr'g Tr. at 5:2–10, thereby "demonstrat[ing] that he is a productive member of the community," Def.'s Mot. at 3. He has also complied fully with other terms of his supervised release, with timely submission of monthly written reports, no new arrests, negative drug tests, and no further payment obligation for his special assessments. *See* Gov't's Opp'n ¶ 5; Def.'s Mot. at 4. The defendant plans to enroll in school and has aspirations to obtain his Commercial Driver's License in order to drive trucks. *See* Mot. Hr'g Tr. at 13:10–21.

The defendant's current probation officer, who has supervised him since May 2015 in Georgia, indicated to both defense counsel and the government that she does not oppose the motion for early termination, *see* Def.'s Mot. at 4–5; Gov't's Opp'n ¶ 5, but subsequently relayed to the government the "office's position" that "given the severity of the charges and the defendant's role," the "agency's position is that supervision should continue," Gov't's Opp'n ¶6; *see also* Gov't's Submission Sealed Probation Office Mem., dated June 5, 2017, ECF No. 455 (repeating recommendation).

## II.    DISCUSSION

The defendant is currently almost halfway through his ten-year term of supervised release. This decade-long supervised release term was the mandatory minimum term required by the defendant's conviction for being a person "at least eighteen years of age" who used "a person

under eighteen years of age" to commit a federal drug trafficking offense, in violation of 21 U.S.C. § 845b, *recodified at* 21 U.S.C. § 861.[4] Violation of this statute triggers imposition of a term of supervised release of "at least twice the term of supervised release otherwise authorized for a first offense." 21 U.S.C. § 861(b). Since the defendant's convictions on Counts 1, 9, and 20 for conspiring to, and engaging in, unlawful distribution and possession with intent to distribute fifty grams or more of a mixture containing cocaine base, in violation of 21 U.S.C. §§ 841(a) and 841(b)(1)(A)(iii), each carried five-year mandatory minimum terms of supervised release, his conviction for using a juvenile in a drug trafficking offense, in violation of 21 U.S.C. § 845b, resulted in doubling to ten years the minimum mandatory term of supervised release that the sentencing judge was required to impose.[5]

The defendant now seeks relief from these mandatory supervised release terms, under 18 U.S.C. § 3583(e)(1), which authorizes termination of a term of supervised release "at any time after the expiration of one year of supervised release," so long as certain factors set out in § 3553(a) are considered and the release "is warranted by the conduct of the defendant released and the interest of justice." 18 U.S.C. § 3583(e)(1). The government acknowledges that the defendant "has made substantial progress in turning his life in a good direction," Gov't Opp'n ¶ 2, but nonetheless opposes early termination of supervised release in this case, due to (1) "the incredibly destructive and violent drug operation that was at the heart of the defendant's activities," *id*. ¶ 1, and resulted in "enormous harm to the community," *id*. ¶ 4; and (2) "the very

---

[4]     The Crime Control Act of 1990, Pub. L. 101-647, redesignated 21 U.S.C. § 845b, which is now codified at 21 U.S.C. § 861.
[5]     The defendant is currently subject to concurrent supervised release terms of five years on his remaining convictions on Counts 1, 9, and 20, while his concurrent supervised release terms of three years on Counts 3, 8, and 12 have already been completed successfully.

minimal requirements of his current supervision," combined with "the ever-present-dangers of recidivism that any defendant faces," *id*. ¶¶ 2, 8.

At the outset, the parties agree that this Court may modify the statutorily mandated five- and ten-year concurrent terms of supervised release, though each side provides different reasoning for this conclusion. *See* Def.'s Suppl. Mem. Supp. Mot. Term. Super. Rel. ("Def.'s Suppl. Mem.") at 1, ECF No. 449; Gov't's Suppl. Mem. Opp'n Def.'s Mot. Term. Super. Rel. ("Gov't's Suppl. Mem.") ¶¶ 11–12, ECF No. 451; Mot. Hr'g Tr. at 16:17–20 (government counsel stating that "given the construction of the statutes here," this Court has "discretion . . . to terminate even a mandatory term of release"). In the defendant's view, the D.C. Circuit "resolved this issue in *United States v. Epps*, 707 F.3d 337 (D.C. Cir. 2013)." Def.'s Suppl. Mem. at 1. There, the D.C. Circuit found that the defendant's appeal of the denial of a motion to reduce his sentence, under 18 U.S.C. § 3582(c)(2), due to a Guideline amendment reducing his applicable sentencing range, was not moot, despite the defendant having been released from prison during the pendency of the appeal, because he remained subject to a mandatory five-year term of supervised release and resolution of the appeal could affect his term of supervised release. *Epps*, 707 F.3d at 352–53.[6]

The D.C. Circuit, however, sidestepped the precise issue presented here of the district court's authority to modify, under 18 U.S.C. § 3583(e)(1), a mandatory supervised release term

---

[6]    As here, the defendant in *Epps* was sentenced prior to a 2002 amendment to 21 U.S.C. § 841 clarifying that the "ceiling" limiting the term of supervised release set out in 18 U.S.C. § 3583(b)(2) for different classes of felonies did not affect "§ 841's floor," *Epps*, 707 F.3d at 342, a statutory change that the D.C. Circuit held was "prospective only," *id*. at 343. Consequently, the Court ultimately rejected "[t]he government's position that Congress's clarification of the § 3583/§ 841 conflict removed the district court's discretion in determining the length of Epps' term of supervised release" to the extent that position was predicated on an assumption "that the 2002 amendment to § 841 was retroactive." *Id*. at 342. This limited holding does not directly address the issue of whether a statutorily-mandated supervised release term imposed before the 2002 amendment is subject to modification under 18 U.S.C. § 3583(e)(1).

imposed under 21 U.S.C. § 841(a). While noting a 2002 amendment, which added the phrase "*Notwithstanding section 3583 of title 18*," to the penalty section in § 841(b)(1)(A), the court declined to find that amendment applied retroactively to bar the court's authority to grant relief under § 3583(e) to the defendant who had been sentenced before 2002. *Id*. at 343. At the same time, the Court also declined to decide how "to harmonize the apparent conflict between the statutes before 2002," *id*., including whether the authority to modify supervised release terms under § 3583(e) extends to statutorily mandated terms under § 841(b), since that issue "has not been briefed, and the question can be determined by the district court when it addresses Epps' pending § 3583 motion, . . . or some successor motion," *id.*; *see also id*. at 353 ("[I]t remains for the district court to address the pre-amendment inter-circuit conflict as to which of two provisions on supervisory release applies to Epps in considering his pending motion to reduce his supervisory term."). Thus, *Epps* is not as dispositive as the defendant posits.

Nevertheless, as the government points out, the Supreme Court, *in dicta,* in *United States v. Johnson*, 529 U.S. 53, 60 (2000), "explicitly noted that Section 3583(e)(1) relief was available for the pre-2002 Section 841 drug conviction before it." Gov't's Suppl. Mem. ¶ 11 (quoting Supreme Court's statement in *Johnson*, 529 U.S. at 60, that: "Respondent may invoke § 3583(e)(2) in pursuit of relief; and, having completed one year of supervised relief, he may also seek relief under § 3583(e)(1)."). The weight of authority confirms that § 3583(e)(1) authorizes termination of statutorily mandated term of supervised release resulting from a pre-2002 conviction under § 841(a). *See* Def.'s Suppl. Mem. at 3 (collecting cases, including *United States v. Spinelle*, 41 F.3d 1056, 1056–57, 1060–61 (6th Cir. 1994); *United States v. McClister*, No. 2:02-CR-87 TS, 2008 WL 153771, at *1–*2 (D. Utah Jan. 14, 2008); *United States v. Scott*, 362 F. Supp. 2d 982, 983–84 (N.D. Ill. 2005); *United States v. Vargas*, 564 F.3d 618, 622–23 n.3

(2d Cir. 2009); *United States v. Simmons*, No. 05 Cr. 1049 (JGK), 2010 WL 4922192, at *4 n.1 (S.D.N.Y. Dec. 1, 2010)); *see also* U.S. SENTENCING COMMISSION, FEDERAL OFFENDERS SENTENCED TO SUPERVISED RELEASE 35 (July 2010) ("U.S.S.C. Report") (stating early terminations under 18 U.S.C. § 3583(e)(1) "may occur even in cases where a statute originally required the sentencing court to impose a term of supervised release in excess of one year").

Thus, the requisite factors under § 3583(e)(1) are addressed next. In this regard, the D.C. Circuit has instructed, at least in the context of a *denial* of a motion for early termination of supervised release, that the district court explain its consideration of the requisite factors, unless "the reasons for denying the motion are apparent from the record." *United States v. Mathis-Gardner*, 783 F.3d 1286, 1289–90 (D.C. Cir. 2015) (remanding denial of defendant's motion for early termination of supervised release, which motion was "strongly supported" by the government, in order to clarify record regarding "what factors the District Court considered in denying early termination" (emphasis omitted)). The reasoning of the D.C. Circuit applies equally to a decision to *grant* such a motion in order for the appellate court to fulfill its "responsibility to review [discretionary] rulings carefully and to rectify any erroneous application of legal criteria." *Id.* at 1290 (internal quotation marks and citations omitted); *cf. United States v. Boyd*, 606 Fed. App'x 953, 959 (11th Cir. 2015) ("As a general matter, in weighing the above considerations, the court need not 'articulate the applicability of each factor, as long as the record demonstrates that the pertinent factors were taken into account.'" (quoting *United States v. Douglas*, 576 F.3d 1216, 1219 (11th Cir. 2009))). Consequently, discussed below are, first, the relevant factors under § 3553(a) and, second, whether the defendant's post-incarceration conduct and the interest of justice warrant early termination of supervised release as requested by the defendant.

## A. Consideration of Pertinent § 3553(a) Factors

In evaluating a motion for early termination of supervised release, the court is directed to consider the following seven factors: (1) the nature and circumstances of the offense and the defendant's history and characteristics; (2) deterrence of criminal conduct; (3) protection of the public from further crimes of the defendant; (4) the need to provide the defendant with educational or vocational training, medical care, or other correctional treatment; (5) the applicable sentencing guideline range for the offense and pertinent policy statements issued by the U.S. Sentencing Commission; (6) the need to avoid unwarranted sentencing disparities; and (7) the need to provide restitution to any victims of the offense. *See* 18 U.S.C. § 3583(e) (authorizing modification of supervised release "after considering the factors set forth in" § 3553(a)(1), (a)(2)(B)–(D), and (a)(4)–(7)).

By contrast to the factors applicable to imposition of the original sentence, certain factors are excluded from consideration in assessing requests for early termination of supervised release, including the factors specified in § 3553(a)(2)(A) (referring to "the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense"), and § 3553(a)(3) (referring to "the kinds of sentences available"). *See* 18 U.S.C. § 3583(e) (omitting reference to § 3553(a)(2)(A) and (3)). This is because supervised release "serves an entirely different purpose than the sentence imposed under § 3553(a)." *Pepper v. United States*, 562 U.S. 476, 502 n.15 (2011). As the Supreme Court explained, "[s]upervised release fulfills rehabilitative ends, distinct from those served by incarceration." *Johnson*, 529 U.S. at 59. Pointing out that "Congress intended supervised release to assist individuals in their transition to community life," *id*., the Court has stressed that "supervised release, unlike incarceration, provides individuals with postconfinement assistance,"

*id.* at 60. *See also Johnson v. United S*tates, 529 U.S. 694, 708–09 (2000) (recognizing "[t]he congressional policy in providing for a term of supervised release after incarceration is to improve the odds of a successful transition from the prison to liberty").

The Supreme Court's view of the role of supervised release is reflected in the legislative history, which "was quite explicit about this, stating that the goal of supervised release is 'to ease the defendant's transition into the community after the service of a long prison term for a particularly serious offense, or to provide rehabilitation to a defendant who has spent a fairly short period in prison for punishment or other purposes but still needs supervision and training programs after release.'" *Id.* at 709 (quoting S. Rep. No. 98-225, p. 124 (1983)). This is predicated on the structure of the federal sentencing system created by the Sentencing Reform Act of 1984, which eliminated parole in favor of determinate sentencing, requiring incarceration "until the expiration of the term imposed, or until earlier released for satisfactory behavior . . . ." 18 U.S.C. § 3621(a); *id.* § 3624(a) (directing prisoner's release "on the date of the expiration of the prisoner's term of imprisonment, less any time credited toward the service of the prisoner's sentence" for satisfactory behavior). As explained in the Guidelines Manual, "[u]nlike parole, a term of supervised release does not replace a portion of the sentence of imprisonment, but rather is an order of supervision in addition to any term of imprisonment imposed by the court." U.S.S.G., Ch. 7, Pt. A(2)(b), intro. comment.; *see also id.* Ch. 1, Pt. A, Subpt. 1, intro. comment. (observing that Sentencing Reform Act "sought to avoid the confusion and implicit deception that arose out of the pre-guidelines sentencing system which required the court to impose an indeterminate sentence of imprisonment and empowered the parole commission to determine how much of the sentence an offender actually would serve in prison," a practice that "usually resulted in a substantial reduction in the effective length of the sentence imposed, with

defendants often serving only about one-third of the sentence imposed by the court"); *Gozlon-Peretz v. United States*, 498 U.S. 395, 407 (1991) (describing supervised release as "a unique method of post-confinement supervision invented by the Congress for a series of sentencing reforms").

Moreover, while defendants "may, of course, vary in the degree of help needed for successful reintegration," the Supreme Court has focused on the congressional "aim[] . . . to use the district courts' discretionary judgment to allocate supervision to those releasees who needed it most." *Johnson*, 529 U.S. at 709; *id*. ("Supervised release departed from the parole system it replaced by giving district courts the freedom to provide postrelease supervision for those, and only those, who needed it."). The relevant factors under § 3553(a) are, consequently, evaluated mindful of the Supreme Court's clear articulation of the purpose of supervised release and the district court's discretion to limit terms of supervised release to those "who need[] it."

Turning now to application of the enumerated factors to the defendant, the Court notes that several have little to no relevance here. For example, the fifth factor requiring consideration of the Sentencing Commission's guidelines and policy statements, under § 3553(a)(4) and (5), is constrained by the fact that the Commission has not promulgated any guidelines or policy statements addressing early termination of supervised release, but limited its policy guidance to violations of supervised release. *See generally* U.S.S.G., Ch. 7, Pts. A & B. In addition, given the "vary[ing] . . . degree of help" different defendants may need for reintegration into the community, *Johnson*, 529 U.S. at 709, the sixth factor of avoiding unwarranted sentencing disparities, under § 3553(a)(6), would generally undermine the case specific inquiry required in evaluating a motion for early termination of supervised release, such that this factor has limited utility in this context. Further, the defendant has no restitution obligation to any victims of his

offenses, rendering inapplicable the seventh factor under § 3553(a)(7). The remaining four factors are addressed *seriatim* below.

### 1. Section 3553(a)(1)—Nature and Circumstances of the Offense

First, the nature and circumstances of the offense, as described by the Court at the time of the defendant's sentencing, indicate that the defendant was the "right-hand man" of the leader of a violent drug distribution ring and that he "personally used guns and actual violence to further his business, and used juveniles." Gov't's Opp'n ¶ 4 (quoting Sentencing Hr'g Tr., dated Oct. 18, 1989, at 11–17). The defendant was implicated in "plac[ing an] Uzi in the mouth" of another person; conspiring to hold another person captive and beat him; and was "going to shoot somebody, but the gun jammed." *Id*. This offense conduct is chilling, but even the government concedes that "the defendant has paid a large debt to society for those harms," Gov't's Opp'n ¶ 2, having been incarcerated and then under supervision since 1989, or twenty-eight years— longer than the defendant was even alive at the time of his initial arrest.

As the government correctly notes, "the question before this Court is not whether the defendant should be punished any further, but rather whether his minimal supervision while he works and lives in Georgia should remain in place in order to ensure that his life *continues to stay moving in the right direction*." *Id*. (emphasis in original). The government's question actually focuses on the second and third enumerated factors regarding the need to deter criminal conduct and protect the public from further crimes of the defendant—in short, the defendant's risk of recidivating, which are considered next.

### 2. Sections 3553(a)(2)(B) and (C)—Adequate Deterrence and Protecting the Public

In considering this question, the Court is mindful that no crystal ball is available to foresee what the future holds for this defendant, *see United States v. Neal*, 810 F.3d 512, 519–

520 (7th Cir. 2016) (observing that "a judgeship does not come equipped with a crystal ball" (internal quotation marks omitted)), but certain salient facts are highly encouraging. Notably, the defendant participated during his long incarceration in many programs designed to support his successful return to the community, including completion of about 900 hours of educational development,[7] 225 hours of vocational building maintenance training, 92 hours of parenting classes, and numerous other courses, including a victim impact program and a psychological self-study. *See* Def.'s Suppl. *Pro Se* Mot. Reduce Sentence at 11, ECF No. 316; Probation Mem., dated Nov. 1, 2011, at 2, ECF No. 347. The defendant also incurred ten disciplinary reports, including for fighting and possessing weapons, which is troubling both in nature and number; however, as noted, *supra* Part I.C, the majority of these incidents occurred in the first decade of the defendant's incarceration and the last of those occurred over thirteen years ago. Probation Mem., dated Nov. 1, 2011, at 2.

While the record of the defendant's early years in prison is decidedly mixed, his record in the latter years of incarceration as well as on release is excellent. According to his supervising Probation Officer, the defendant "may fall into a rare category of person who has turned his life around," Gov't's Opp'n ¶ 5, and he has no outstanding financial obligations from his convictions, *id.* ¶ 6; *cf. United States v. Ferrell*, No. 13-0324 (RC), 2017 WL 149950, at *3 (D.D.C. Jan. 13, 2017) (denying, without prejudice, motion for early termination of probation, citing "[o]f particular importance to this case," the defendant's unpaid restitution balance, and noting "[a]n unblemished record of restitution payments going forward would be relevant to the Court's analysis of whether" early termination was warranted). The defendant is no longer a

---

[7] Although the defendant did not earn his GED, his 1989 Presentence Report, PSR ¶ 94, indicates that he had been enrolled in special education programs prior to leaving school in the 10th grade, making his continued effort and many educational hours in prison commendable.

volatile teenager, as he was at the time of his offense conduct, but forty-eight years old. Moreover, he has plainly embraced the responsibilities of marriage and parenthood, with a stable home and employment.

The defendant's maintenance of an unblemished record of compliance with his conditions of release for over four years is, perhaps, the best indicator of his ability to continue as a law-abiding member of his community. The last comprehensive analysis by the U.S. Sentencing Commission of supervised release data reveals that "[v]iolations of conditions of supervision that result in revocation on average occur early in the supervision process," citing, for example, that, "in 2006, offenders whose supervision was revoked . . . served an average of only 17 months before revocation." U.S.S.C. Report at 63 (citing, at 64, Fig. 3, showing that, over the period from 2003 to 2006, twenty-one months was the highest average supervision period served before revocation); *see also id.* at 63 n.265 ("The fact that offenders on federal supervision who violate the conditions of supervision tend to do so early in their terms of supervision is consistent with findings of other researchers.").[8]

Indeed, based upon extensive analysis of recidivism data and supervised release, the U.S. Sentencing Commission in 2011 reduced the minimum recommended term of supervised release for defendants convicted of Class A and B felonies, such as the defendant's convictions, from three to two years. U.S.S.G., App. C, vol. III, amend. 756 (amending U.S.S.G. § 5D1.2(a) and

---

[8]    This U.S. Sentencing Commission report also found that the rates of successful completion of supervised release decreased across criminal history categories, with those offenders in criminal history categories I and II having markedly higher rates of successful closures without revocations than other such categories. U.S.S.C. Report at 66–67 (Fig. 4 showing, for fiscal year 2008, successful completion for offenders in CHC I of 81.3% and in CHC II of 67.5%, compared to CHC III of 58.5%, CHC IV of 50.6%, CHC V of 44.4%, and CHC VI of 40.2%). In this regard, the defendant was in criminal history category II at the time of his sentencing, due to his criminal history score of 3 points, based on his juvenile conviction in New York, when he was seventeen years old, for criminal possession of a controlled substance, for which he received a probationary sentence as a youthful offender, and his commission of the instant offense while on probation for that juvenile conviction. PSR, ¶¶ 41–45. Thus, the instant convictions were the defendant's first and only federal felony convictions.

explaining that "the amendment lowers the minimum term of supervised release required by the guidelines . . . when a statute does not require a higher minimum term," and that "[t]he Commission determined that these lesser minimum terms should be sufficient in most cases because research indicates that the majority of defendants who violate a condition of supervised release do so during the first year of the term of supervised release"). In other words, based on the U.S. Sentencing Commission's evidence-based research of data generated between 2005 and 2009, absent the operation of the defendant's statutes of conviction requiring mandatory minimum terms of supervised release of ten or five years, the recommended terms of supervised release for the defendant would be "[a]t least two but not more than five years." U.S.S.G. § 5D1.2(a)(1).

In this case, the length of time that the defendant has been able to maintain full compliance with his conditions of release, together with his current lifestyle choices, are positive and significant signs that his risk of recidivism is low. The defendant expressed himself well at the hearing, stating, "I learned from my mistakes. My main objective is to keep a job, stay out of trouble and provide for my family, and give my son a better life than I had." Mot. Hr'g Tr. at 32:11–15.

### 3. Section 3553(a)(2)(D)—Training or Correctional Treatment

Finally, with respect to the fourth factor regarding providing the defendant with needed educational or vocational training, medical care, or other correctional treatment, under § 3553(a)(2)(D), the defendant has been able to obtain and maintain full-time employment, along with a promotion, without the need for additional support or supervision. Indeed, the record shows that the defendant has been placed "in the lowest level of supervision," Gov't's Opp'n ¶ 7, without any perceived need by the supervising probation officer for additional training or

treatment. Consideration of this factor shows no continuing need for supervision for the purpose of rehabilitation and further weighs in favor of early termination of supervision.

### B. Consideration of Post-Incarceration Conduct and the "Interest of Justice"

In addition to consideration of the enumerated factors under 18 U.S.C. § 3553(a), the Court must be "satisfied" that early termination of supervised release "is warranted by the conduct of the defendant released and the interest of justice . . . ." 18 U.S.C. § 3583(e)(1). The government urges that the latter factors "must involve at least something of changed circumstances and exceptional behavior and the like" since "[o]therwise, Section 3583(e)(1)'s provisions that raise the requirements above consideration of the enumerated Section 3553 factors—provisions focused on the defendant's conduct and the interest of justice—risk becoming merely buzzwords for an automatic and ministerial termination of supervised release after the passage of 12 months." Gov't's Second Suppl. Mem. Opp'n Def.'s Mot. Term. Super. Rel., ("Gov't's 2d Suppl. Opp'n") ¶ 3, ECF No. 458. In other words, absent some changed circumstances or heightened form of unusual or exceptional behavior by a supervised defendant, in the government's view, motions for early termination of supervised release should be routinely denied.

The Court is mindful that the government's position has support in non-binding caselaw from outside this Circuit and by other Judges on this Court.[9] Specifically, model post-

---

[9] The government posits that the D.C. Circuit approved its proffered standard in *Mathis-Gardner*, 783 F.3d. at 1289–90, by quoting approvingly language in *United States v. Lussier*, 104 F.3d 32, 32 (2d Cir. 1996), regarding the "high burden" of "'[o]ccasionally, changed circumstances—for instance, exceptionally good behavior by the defendant'" during supervision to warrant relief under § 3583(e)(1). Gov't's 2d Suppl. Opp'n ¶ 4; *id*. ("The D.C. Circuit thereby favorably quoted from the principle in *Lussier* that changed circumstances and exceptionally good behavior are the hallmarks of the 'occasional' relief of early supervised release termination that can be afforded by Section 3583(e)(1)."). Rather than adopting the *Lussier* standard as the appropriate one to apply, however, the D.C. Circuit merely noted that this stringent standard had apparently been met, rendering the reasons for the trial court's denial, without explanation, of a motion for early termination of supervised release in that case impossible to discern from the record and thus requiring remand.

incarceration conduct and unblemished compliance with the terms of supervised release, standing alone, have been found insufficient to warrant early termination of supervised release when the defendant has not "show[n] something 'of an unusual or extraordinary nature' in addition to full compliance." *United States v. Longerbeam*, 199 F. Supp. 3d 1, 2–3 (D.D.C. 2016) (quoting *United States v. Etheridge*, 999 F. Supp. 2d 192, 196 (D.D.C. 2013) (quoting *United States v. Caruso*, 241 F. Supp. 2d 466, 469 (D.N.J. 2003)));[10] *see id.* (denying motion for early termination of supervised release, noting D.C. Circuit's reference in *Mathis-Gardner* to *Lussier*, and explaining that "even perfect compliance with conditions of release does not qualify as 'exceptionally good behavior' warranting early termination" (quoting *Etheridge*, 999 F. Supp. 2d at 196)); *United States v. Mathis-Gardner*, 110 F. Supp. 3d 91, 93–94 (D.D.C. 2015) (noting courts "have found that mere compliance with the conditions of release is not enough to merit early termination of supervised release because 'model prison conduct and full compliance with the terms of supervised release is what is expected of a person under the magnifying glass of supervised release'" (quoting *United States v. McKay*, 352 F. Supp. 2d 359, 361 (E.D.N.Y. 2005))); *United States v. Medina*, 17 F. Supp. 2d 245, 247 (S.D.N.Y. 1998) ("While [the defendant's] post-incarceration conduct is apparently unblemished, this alone cannot be

---

[10]   Perhaps due to this high bar, the U.S. Sentencing Commission reports that only a small proportion, "17.9 percent of successful closures (representing 12% of all supervision cases), were early terminations by the court, which may occur at any time after one year of supervision if the court determines such action is warranted by the defendant's conduct and serves the interests of justice." U.S.S.C. Report at 62. The Commission further noted a recidivism study conducted by the Administrative Office of the U.S. Courts showing that "early-term offenders in this study presented a lower risk of recidivism than their full-term counterparts." *Id.* at 62–63 n.263 (citing James L. Johnson, *Are Early Terminated Offenders a Greater Risk to the Community*, News & Views, Vol. XXXV, No. 2, Jan. 18, 2010, at 1 (biweekly newsletter published by the AOUSC-OPPS)). In light of this data analysis, the U.S. Sentencing Commission thereafter amended the commentary to the Guidelines in 2011 with a reminder that "[t]he court has authority to terminate or extend a term of supervised release" under § 3583(e)(1) and, without any reference to satisfying a standard of "exceptional or unusual" supervision conduct, provided the example that "the court may wish to consider early termination of supervised release if the defendant is an abuser of narcotics, other controlled substances, or alcohol who, while on supervised release, successfully completes a treatment program, thereby reducing the risk to the public from further crimes of the defendant." U.S.S.G. § 5D1.2, comment. (n.5).

sufficient reason to terminate the supervised release since, if it were, the exception would swallow the rule."); *cf. United States v. Johnson*, No. 13-cr-36 RCL, 2017 WL 87008, at *1 (D.D.C. Jan. 9, 2017) (adopting magistrate judge recommendation for early termination, notwithstanding that "good behavior alone is insufficient to warrant early termination" where both defense counsel and the government recommended termination and "by present-day measures of sentences suitable to the Defendant and his crime, . . . Defendant has been punished sufficiently"); *Etheridge*, 999 F. Supp. 2d at 196–97 (noting that "*Lussier* did not define what 'exceptionally good behavior'" is and acknowledging that, in reviewing § 3583(e)(1) petitions, courts have concluded that "even perfect compliance with conditions of release does not qualify as 'exceptionally good behavior' warranting early termination," but granting motion for early termination based on defendant's regular attendance at addiction meetings, avoidance of "parties [and] other places where alcohol or drugs will be served" and association "with individuals who consume drugs," reconciliation with family members, holding job with promotion, and keeping busy with "physical activities, exercise").

This gloss on the statutory text setting a high bar for early termination of supervised release may have concomitant benefits. Requiring some changed circumstance or "unusual or extraordinary" showing would avoid repeated motions to the district court to reassess essentially the same § 3553(a) factors considered at the original sentencing, on the chance that the assessment may come out differently "after expiration of one year of supervised release." 18 U.S.C. § 3583(e)(1). Reducing such repeated motions would also serve the significant interest in the finality of judgments.

Nevertheless, construing § 3583(e)(1) to require the defendant to exhibit objectively extraordinary or unusual conduct during supervision is a stretch not expressed in the statutory

text. To be sure, the "interest of justice" component must be understood in relation to the defendant's conduct under supervision, but that factor encompasses broader consideration of the circumstances surrounding the supervised release term. Indeed, § 3583(e)(1) invites flexible reexamination of the continued need for supervised release "at any time" after one year of supervision has lapsed. As one court has observed, "[f]inality—in the sense of predictability or lack of potential for change—may sometimes be at odds with the purposes of supervised release because a supervisee's rehabilitative needs are often fluid or evolving." *United States v. Begay*, 631 F.3d 1168, 1173 (10th Cir. 2011).

In this case, the government stresses that no matter the extent of the defendant's rehabilitation, his egregious criminal conduct leading to his convictions, involving drug distribution, firearms, and violence that resulted in the serious bodily injury to others, militates against a further reduction in the defendant's sentence, which has already been substantially reduced over the years from his original sentence. Yet, the defendant has showed for over four years on supervised release that he can conduct himself in a law-abiding, productive manner, with minimal supervision.[11] Whether this conduct is sufficiently "exceptional or unusual" to satisfy the government's suggested "high burden" may be questionable, but that is not the standard applied here. Instead, the defendant's exemplary compliance with all of the terms of his supervised release, in combination with his respectful and honest demeanor at the motion hearing, his change in "his inner and outer circle of friends many years ago," Def.'s Submission, Spouse's Letter, dated June 6, 2017, at 1, ECF No. 456-1, his gainful and successful full-time

---

[11] The defendant answered honestly at the motion hearing that his compliance with the terms of his minimal supervision was, as the government proffered, not burdensome. Mot. Hr'g Tr. at 9:12–24; 13:10–12. For example, the defendant expressed that one reason for seeking early termination was to avoid having to obtain the permission of the Probation Office when he visited his aging mother in New York, but he conceded that such permission had not been denied. *Id*. at 13:4–9.

employment, participation in his community through church attendance, assisting at his son's pre-school, and volunteering in a youth program, and his continuing diligence in working to improve his life and prospects, amply demonstrate that his conduct on supervised release and successful reintegration into his community has been exemplary, and that "continuing the defendant's probation would have no real value as far as law enforcement or any other community interest is concerned," *Etheridge*, 999 F. Supp. 2d at 199 (internal quotation marks and citation omitted). Thus, consideration of "the conduct of the defendant released," as required by § 3583(e)(1), warrants early termination of his ten-year term of supervision.

For the same reason, such early termination is also in the "interest of justice." This consideration is bolstered by the fact that the defendant's original supervised release term was doubled from 60 to 120 months due to his use of juveniles in drug trafficking offenses, when the defendant was barely aged-out of being a juvenile himself. Accordingly, the Court will reduce his supervised release term to 60 months, which is the mandatory minimum term to which he was subject on most of his remaining counts of conviction, and find this reduction to be in the interest of justice. *See United States v. Parker*, 219 F. Supp. 3d 183, 184 (D.D.C. 2016) (adopting magistrate judge recommendation for early termination, after four years of supervision, of ten-year term of supervised release, which term was originally imposed pursuant to mandatory minimum term provided for drug trafficking crime occurring in school zone, since "[h]ad that not been the case, then Defendant would have been subject only to a mandatory five-year period of supervised release in 1998 and a four-year period of supervision today" and defendant had "record of successful rehabilitation while on supervision," *see id.* at 191). While this reduction is substantial, it also provides due respect to the congressional policy choice of a mandatory minimum supervised release term of five years to which the defendant was subject as

a result of his multiple convictions for violations of 21 U.S.C. §§ 841(a) and 841(b)(1)(A)(iii). Since the defendant has served four years and seven months of his term of supervised release to date, he will continue to be subject to minimal supervision for a further five months.

## III.     CONCLUSION

Upon consideration of the Defendant's Motion for Early Termination of Supervised Release, ECF No. 445, the related legal memoranda in support and in opposition, and the entire record herein, including the hearing, for the reasons set forth above, it is hereby

**ORDERED** that the defendant's Motion is GRANTED; and it is further

**ORDERED** that the defendant's term of supervised release is reduced from 120 months to 60 months.

**SO ORDERED**.

Date: July 7, 2017

_____
BERYL A. HOWELL
Chief Judge